1  E. MARTIN ESTRADA
   United States Attorney
2  MACK E. JENKINS
   Assistant United States Attorney
3  Chief, Criminal Division
   MONICA E. TAIT (Cal. Bar No. 157311)
4  Assistant United States Attorney
   Major Frauds Section
5       1100 United States Courthouse
        312 North Spring Street
6       Los Angeles, California 90012
        Telephone: (213) 894-2931
7       Facsimile: (213) 894-6269
        E-mail:    Monica.Tait@usdoj.gov
8  AMANDA N. LISKAMM
   Director, Consumer Protection Branch
9  WEI XIANG
   MEREDITH B. HEALY
10 Trial Attorneys
   Consumer Protection Branch
11 U.S. Department of Justice
        450 Fifth Street, NW, Suite 6400
12      Washington, DC 20001
        Telephone: (202) 532-4140
13      Facsimile: (202) 514-8742
        E-mail:  Wei.Xiang@usdoj.gov
14               Meredith.B.Healy@usdoj.gov

15 Attorneys for Plaintiff
   UNITED STATES OF AMERICA

16

17              UNITED STATES DISTRICT COURT

18          FOR THE CENTRAL DISTRICT OF CALIFORNIA

19 UNITED STATES OF AMERICA,        No. 20-CR-00621-AB

20      Plaintiff,                  GOVERNMENT'S SENTENCING POSITION
                                    AS TO DEFENDANT BOWEN HU;
21      v.                          MEMORANDUM IN SUPPORT

22 BOWEN HU,                        Sentencing Date: March 22, 2024
                                    Time: 1:30 p.m.
23      Defendant.                  Place: Courtroom 7B
                                    Before the Honorable André
24                                  Birotte, Jr., United States
                                    District Judge
25

26

27      The United States of America, by and through its counsel of

28 record, the United States Attorney for the Central District of

                                 1

1 | California and Assistant United States Attorney Monica E. Tait, and
2 | Department of Justice Trial Attorneys Wei Xiang and Meredith B.
3 | Healy, hereby files its Sentencing Position concerning defendant
4 | BOWEN HU.
5 |     This Sentencing Position is based on the Presentence Report, the
6 | files and records of this case, and such further evidence and
7 | argument as may be presented at sentencing or any other hearing on
8 | this matter.
9 | Dated: March 1, 2024          Respectfully submitted,

10 |                               E. MARTIN ESTRADA
                                   United States Attorney

11 |                               MACK E. JENKINS
12 |                               Assistant United States Attorney
                                   Chief, Criminal Division

13 |                               MONICA E. TAIT
14 |                               Assistant United States Attorney
                                   Major Frauds Section

15 |                               AMANDA N. LISKAMM
16 |                               Director, Consumer Protection Branch

17 |                               _____
                                   MEREDITH B. HEALY
18 |                               WEI XIANG
                                   Trial Attorneys
19 |                               Consumer Protection Branch
                                   U.S. Department of Justice

20 |
21 |                               Attorneys for Plaintiff
                                   UNITED STATES OF AMERICA
22 |
23 |
24 |
25 |
26 |
27 |
28 |

2

**TABLE OF CONTENTS**

I.    INTRODUCTION................................................1

II.   RELEVANT FACTS PROVEN AT TRIAL.............................3

      A.    HU's Relationship with his Co-Defendants and Their
            Roles...............................................3

      B.    HU Used Laundering Techniques to Cause the Liquidation
            of Target Gift Cards...............................4

      C.    HU's Knowledge......................................6

III.  SENTENCING GUIDELINES CALCULATIONS........................7

      A.    The Base Offense Level is 24........................8

      B.    HU was in the Business of Laundering Funds: +4.......9

      C.    HU Engaged in Sophisticated Laundering Involving
            Multiple Layers: +2...............................10

      D.    HU was a Manager or Supervisor: +3.................11

      E.    Restitution........................................13

IV.   A SENTENCE OF 135 MONTHS, REFLECTING A SENTENCE AT THE LOW-
      END OF THE ADVISORY GUIDELINES RANGE, IS SUFFICIENT BUT NOT
      GREATER THAN NECESSARY TO ACHIEVE THE PURPOSES OF FEDERAL
      SENTENCING...............................................14

      A.    Nature and Characteristics of the Offense, and History
            and Characteristics of HU.........................14

      B.    Need for the Sentence to Reflect the Seriousness of
            the Offense, Promote Respect for the Law, and Provide
            Just Punishment for the Offense, and Need to Promote
            Deterrence........................................15

      C.    Avoiding Unwarranted Sentence Disparities.........17

V.    CONCLUSION...............................................18

i

# TABLE OF AUTHORITIES

**CASES**

United States v. Booker,
        543 U.S. 220 (2005)........................................17

United States v. Aguasvivas-Castillo,
        668 F.3d 7 (1st Cir. 2012)................................16

United States v. Mitchell,
        613 F.3d 862 (8th Cir. 2010)..............................16

United States v. Nicolescu,
        17 F.4th 706 (6th Cir. 2021)..............................16

United States v. Rose,
        20 F.3d 367 (9th Cir. 1994)...............................16

**STATUTES**

18 U.S.C. § 1956..................................................1

18 U.S.C. § 3553.........................................2, 14, 17

28 U.S.C. § 991..................................................17

**OTHER AUTHORITIES**

U.S.S.G. Ch. 1...................................................17

U.S.S.G. § 1B1.3..................................................8

U.S.S.G. § 2B1.1................................................7, 8

U.S.S.G. § 2S1.1.......................................7, 8, 10, 11

U.S.S.G. § 2X1.1..................................................7

U.S.S.G. § 3B1.1...............................................7, 13

U.S.S.G. § 4C1.1.................................................13

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.   INTRODUCTION**

Following a 10-day jury trial, on September 26, 2023, defendant BOWEN HU ("HU") was convicted of Conspiracy to Commit Money Laundering in violation of 18 U.S.C. § 1956(h), as charged in Count One of the Second Superseding Indictment.  Dkt. 294 (Corrected Verdict Form); Dkt. 136 (Second Superseding Indictment).  Evidence at trial proved that from June 2019 through November 2020, HU and his trial co-defendants BLADE BAI ("BAI") and TAIRAN SHI ("SHI") (collectively, "defendants") were part of a highly efficient transnational operation to spend--that is, launder--dirty money stored on Target gift cards that victims had been scammed into buying.  HU and his co-defendants knowingly acquired the fraudulently obtained Target gift card numbers and access codes (collectively, "gift cards") from a group in China that called itself the "Magic Lamp," and then funneled those gift cards to "runners" to liquidate at Target stores in this District.  Those runners, often at HU's direction, would quickly use the cards to purchase high-value consumer electronics and conduct other transactions.  These transactions, as the evidence at trial showed HU well knew, served to retain the value of the gift cards and prevent Target from cancelling the cards and returning the funds on them to defrauded victims.  Over the course of the defendants' 17-month conspiracy, HU and his co-conspirators received more than 5,000 Target gift cards, worth approximately $500 each, for a total of over $2.5 million in laundered fraud proceeds.

On December 20, 2023, the United States Probation and Pretrial Services Office ("USPO") disclosed its Presentence Investigation

1

1  Report ("PSR"), Dkt. 315, and sentencing recommendation, Dkt. 314.
2  The USPO calculated HU's total offense level as 33, his criminal
3  history category as I, and the resulting Sentencing Guidelines range
4  as 135 to 168 months imprisonment.  <u>See</u> PSR at 3.  For reasons that
5  are unclear to the government, the USPO recommended a two-level
6  downward variance to a custodial term of 120 months.  Dkt. 314 at 6.

7      The government agrees with the PSR's calculation of criminal
8  history category and offense level, as well as the resulting
9  Sentencing Guidelines range.  Based on a consideration of the
10 sentencing factors set forth in 18 U.S.C. § 3553(a), however, the
11 government recommends that the Court sentence HU to a term of
12 imprisonment of 135 months (which term is at the low end of the
13 advisory guidelines range), and not vary downwards to 120 months as
14 the USPO recommends.  A significant term of imprisonment is necessary
15 given the extensive, serious, and sophisticated nature of HU's crime
16 (which the evidence showed HU well understood by no later than
17 September 2019) and his flippant characterization during the
18 conspiracy of "telecom scam" victims whose money he knowingly
19 laundered or caused to be laundered as "fools."  Furthermore, by
20 serving as a third-party money launderer, HU facilitated foreign
21 fraudsters' access to the U.S. currency stored on Target gift cards
22 that the fraudsters had obtained through tech support, government
23 imposter, and other scams and which, but for HU and his co-
24 defendants, the fraudsters would not otherwise have had access to.  A
25 lengthy prison sentence is therefore also necessary to deter
26 individuals from acting as money launderers who, through their
27 conduct, facilitate further criminal activity.

28

1    The government agrees with the USPO that the Court should
2    further impose three years of supervised release and a $100 special
3    assessment, and also respectfully requests that restitution be
4    ordered in the amount of $57,156.26 to approximately 77 identified
5    victims.

6    Lastly, as part of the sentence in this matter, forfeiture is
7    mandatory, must be pronounced at sentencing, and must be included in
8    the judgment.  The government will file a separate position as to
9    forfeiture, and one or more proposed Preliminary Orders of Forfeiture
10   to be entered at sentencing.

11   **II.   RELEVANT FACTS PROVEN AT TRIAL**

12   A.   HU's Relationship with his Co-Defendants and Their Roles

13   Early on in their conspiracy, HU served as a runner for BAI.
14   WeChat text messages from the defendants' phones, presented at trial,
15   showed that HU first met with BAI at the latter's store on June 22,
16   2019 specifically to discuss "running," which BAI explained involved
17   "buy[ing] things from 3 to 5 stores every day."  Exhibit ("Ex.") 210
18   at 1-3.[1]  HU thereafter proceeded to ask BAI to distribute gift cards
19   to him, which BAI did, and HU learned from BAI how to liquidate the
20   cards by using them to "get a bottle of water, or food, and a
21   physical gift card" that could then be used to purchase merchandise.
22   Id. at 5; Exs. 211-212.  Shortly thereafter, HU introduced SHI to BAI
23   as another runner.  See Exs. 173, 277.

24

25   [1] References to "Exhibit[s]" followed by a number are to the
     corresponding numbered exhibits admitted at the trial in this matter.
26   Some exhibit citations include specific page number references
     (referring to the printed internal pagination at bottom center of the
27   exhibit).  All cited Exhibits for the three sentencing positions the
     government is filing on the same day are collected in numerical order
28   in the Government's Consolidated Exhibit Volume, filed under separate
     cover.

1    Within a few months, starting in or around September 2019, the

2 defendants' relationship evolved to the roles in which they would

3 largely remain until November 2020: HU and SHI stepped into what had

4 been BAI's role (for example, they received gift cards directly from

5 the Magic Lamp), and BAI transitioned to serving as the fence and

6 financier between HU and SHI and the Magic Lamp.  HU and SHI found

7 and managed their own runners, including Yan Fu and "Second Sister,"

8 who then used the Magic Lamp-sourced gift cards to purchase Target

9 merchandise at HU's and SHI's direction.  See, e.g., Exs. 11-12 (HU

10 and SHI receiving victim-witness D.L.'s gift cards from the Magic

11 Lamp, and HU transmitting them to Yan Fu and Second Sister moments

12 later).  HU and SHI then sold their runner-procured Target

13 merchandise to BAI, who then paid their debts to the Magic Lamp in

14 Chinese currency and gave them their share of the profits.  See,

15 e.g., Ex. 154 (HU and SHI delivering $33,759 in merchandise to BAI's

16 Baldwin Park warehouse and asking for cash).

17    B.   HU Used Laundering Techniques to Cause the Liquidation of
          Target Gift Cards

18

19    The trial evidence showed that, having first started as a runner

20 himself and then progressing to managing his own runner network, HU

21 was well-versed in how the operation worked, including its need for

22 speed and avoiding detection.  In the conspiracy's early days, in

23 June and July 2019, HU learned and executed multiple laundering

24 techniques and principles, which he then shared with his runners.

25 One that applied to every gift card was the speed of use: "regular"

26 or "normal" cards had to be spent within two hours, and "fast" cards

27 within 20 or 30 minutes.  See, e.g., Ex. 12 (HU advising Yan Fu and

28 Second Sister that "fast cards" had to be spent in "half an hour").

4

HU's runners literally "ran" to stay on time; for example, on June 15, 2020, Yan Fu loitered on standby at a Target for two hours before getting and spending her first cards of the day, then raced to 15 other Target stores across the District in the next eight hours (see Ex. 44S), including to spend victim-witness K.K.'s cards which HU supplied to her, the laundering of which is further discussed below.

Speed was so important that what HU and his runners bought almost did not matter.  HU knew that runners should simply conduct a second transaction, to return the purchased merchandise and load the value onto a new physical gift card.  See, e.g., Ex. 214 at 2 (BAI telling HU, "don't leave any balance . . . you need to spend all. You can buy anything, and just spend all.  If what you bought was not what I wanted, you can just get refund back to the physical card after a few days and then give it to me").  HU also was knowledgeable about the money laundering technique of using the purchase of a low-cost food item to concurrently buy a new physical gift card.  See Ex. 211.  Indeed, HU had himself been tasked by BAI with buying batches of $5 gift cards (to which funds could later be loaded).  See Ex. 278.  The defendants' focus on creating new physical gift cards stemmed from their belief that, compared to the card numbers and access codes that they received from the Magic Lamp via WeChat message, physical cards were less likely to be cancelled.  See Ex. 281 (SHI asking in a message thread including HU, "will the physical cards purchased from fast cards be cancelled," to which BAI responded in part, "normally no").

The effect of HU's laundering techniques was illustrated through trial testimony by multiple sample victims and Target personnel. With victim-witness K.K., it took only 13 minutes after K.K. was

scammed into purchasing two $500 gift cards in Illinois for HU to receive those cards from the Magic Lamp and transfer them to Yan Fu, and Yan Fu to then liquidate them at a Target in Chino Hills.  <u>See</u> Exs. 40, 42-43, 47E.  Similarly, victim-witness W.F. purchased two cards at a scammer's direction.  The cards were passed from the Magic Lamp to HU to Yan Fu, who used them to buy less than $5 of food plus $778 in two new gift cards.  <u>See</u> Exs. 32E, 33-38.

C.   <u>HU's Knowledge</u>

Evidence introduced at trial proved that HU learned in November 2019 that the Target gift cards he was buying from the Magic Lamp were sourced from "telecom scam[s]," Ex. 248 at 4-5, and that he was completely unfazed, mocking the many consumers who fall victim to these scams as "fools," <u>id.</u>  His glib response was unsurprising given that HU already knew the cards were crime proceeds; he had previously been warned by BAI not to run in certain geographic locations because "there [we]re problems for a store there that day" involving plainclothes police officers.  Ex. 218.  And HU had learned two months earlier, in September 2019, that Yan Fu had been detained and had merchandise seized by Brea police for purchasing the merchandise with Target gift cards that HU had personally supplied her.  <u>See</u> Exs. 13, 14E, 15, 16, 18R, 240A at 1, 266 at 2.[2]  Four months later, in January 2020, HU learned of a second runner apprehension by La Palma police that again resulted from the use of Target gift cards that he had personally supplied. <u>See</u> Exs. 21, 24 at 4-5, 26.

---

[2]  Although not offered at trial, HU was also present at BAI's storefront on September 20, 2019, when Fontana police executed a search and seized a large volume of merchandise, including merchandise HU and SHI procured.  PSR ¶ 32; CR 256-1 at 2-3 (police report excerpt, Exhibit 1 to Government's Consolidated Reply to Oppositions to Motion In Limine #3).

HU did not stop laundering Target gift cards after any of the blatant signs that he was involved in criminal activity--the runner apprehensions and merchandise confiscation by local police, the knowledge of plainclothes police surveillance at Target retail stores, and the awareness that gift cards were sourced from telecom scams.  To the contrary, he and his co-defendants carried on, while taking additional care so as not to get caught.  See Ex. 26 at 5 (HU and SHI, after Second Sister's arrest, concluded Target gift cards could "still be done in the future[,]" so long as they "maintain[ed] a low profile").  Between November 2019 and November 2020, the defendants received on just one message thread with the Magic Lamp over 5,000 Target gift cards, worth approximately $500 each, for a total approximate value of $2.5 million.  Only when federal agents executed search warrants for his and his co-defendants' residences and BAI's warehouse on November 17, 2020 (concurrently arresting BAI and Yan Fu), did HU's criminal activity stop.  See, e.g., Ex. 200.

## III. SENTENCING GUIDELINES CALCULATIONS

The government and the USPO agree that the advisory Sentencing Guidelines calculation for HU (who falls within Criminal History category I) is as follows:

| | | |
|---|---|---|
| Base offense level: | 24 | U.S.S.G. §§ 2B1.1(b)(1)(I), 2S1.1(a)(2), 2X1.1(a) |
| Business of Money Laundering: | +4 | U.S.S.G. § 2S1.1(b)(2)(C) |
| Sophisticated laundering: | +2 | U.S.S.G. § 2S1.1(b)(3) |
| Manager/Supervisor: | +3 | U.S.S.G. § 3B1.1(b) |
| Adjusted Offense Level: | 33 | (Criminal history I: 135-168 months) |

7

1      A.   <u>The Base Offense Level is 24</u>

2          The government and the USPO agree that a base offense level of

3    24 is appropriate under U.S.S.G. §§ 2S1.1(a)(2) and 2B1.1(b)(1)(I),

4    because the loss amount attributable to HU is over $1.5 million.  <u>See</u>

5    PSR ¶¶ 30-31.  This base offense level is calculated off a subset of

6    gift cards transmitted from the Magic Lamp to BAI, HU, and SHI.  <u>Id.</u>

7    As adduced at trial, following Yan Fu's Brea police seizure in

8    September 2019, HU had an issue with the Magic Lamp about paying for

9    the seized property.  On November 2, 2019, Magic Lamp member and co-

10   conspirator "4" established a new WeChat thread for HU, which allowed

11   him to resume receiving the Magic Lamp's cards.  <u>See</u> Ex. 102.[3]  This

12   thread lasted through November 16, 2020.  <u>See</u> Ex. 123.  Over 5,000

13   unique gift cards were transmitted through this thread, most of which

14   "held" $500.  <u>See</u> PSR ¶¶ 30-31.  By this time in his relationship

15   with BAI, HU (and later, HU and SHI) was responsible for getting

16   these cards liquidated and BAI was his financier.  Accordingly, all

17   transactions HU and the runners executed with the gift cards was at

18   HU's (and sometimes SHI's) direction, and HU is responsible for these

19   acts.  U.S.S.G. § 1B1.3(a)(1)(A) and (B).  Therefore, the value of

20   laundered funds for Count One is reasonably estimated as $2.5

21   million.  <u>Id.</u>

22          This figure undercounts the value of laundered funds.  It does

23   not include any gift cards from an earlier Magic Lamp thread that "4"

24   established for HU on August 2, 2019.  <u>See</u> Ex. 110; <u>see, e.g.</u>, Ex. 11

25   (Magic Lamp transmitting to HU and SHI scam victim D.L.'s cards,

26   which HU would then funnel to Yan Fu, and Yan Fu would then launder,

27

28          [3] HU added BAI and SHI to this WeChat message thread in February
     2020.  <u>See</u> Exs. 103-104.

in September 2019).  This figure also does not include any cards from the early days of the conspiracy in June and July 2019, before HU first connected directly with the Magic Lamp.  See, e.g., Ex. 3 (spreadsheet in BAI's Google account listing $1,900 gift card originally funded by scam victim K.G. and laundered by Yan Fu in July 2019).

Therefore, $2.5 million is not only a reasonable estimate, it is also a conservative estimate for HU's loss amount.

B.   HU was in the Business of Laundering Funds: +4

The government and the USPO agree that HU was in the business of laundering funds.  PSR at ¶¶ 46-49.  As proven at trial, HU conspired with his co-defendants and others to launder dirty money stored on Target gift cards that victims had been scammed into buying. Although HU joined the conspiracy in June 2019 as a runner who personally liquidated fraudulently-obtained Target gift cards at Target retail stores by using them to purchase merchandise and/or transfer much of their values to fresh gift cards, see Exs. 210-212, by September 2019, he had risen within the conspiracy's hierarchy into a role in which he managed a network of runners, including Yan Fu and "Second Sister."  Upon receiving Target gift card numbers and access codes from the Magic Lamp, HU would immediately transfer them to one or more of his runners with instructions as to how quickly the card values needed to be drained.  See, e.g., Exs. 11-12.

HU derived criminal proceeds from this activity by selling his runner-procured Target merchandise to BAI, who then paid the Magic Lamp on HU's behalf and distributed to HU his share of the profits. WeChat messages exchanged between HU and BAI throughout the conspiracy show that HU sold tens of thousands of dollars' worth of

9

Target merchandise or gift cards to BAI with each delivery.  See Ex. 279 at 3 (in August 2019, BAI told HU and SHI not to bother with delivering loads worth just a few thousand dollars); see, e.g., Ex. 154 at 4 (in September 2019, HU and SHI delivered $33,759 worth of Target merchandise to BAI); Ex. 229 (in June 2020, HU reported a total of $31,373.60 should be transferred to the Magic Lamp); Ex. 230 (in July 2020, HU sold Target merchandise totaling $13,985 to BAI). HU's and BAI's WeChat messages also prove that HU routinely asked BAI to pay him his share of the proceeds:  for example, on November 17, 2019, HU instructed BAI to "bring 2000 cash to me," Ex. 220; on December 10, 2019, HU asked BAI to "take 1800 to give to" an associate to pay HU, Ex. 221 at 1; on June 9, 2020, HU instructed BAI to "transfer [RMB] 5000 to me and the balance transfer to Magic Lamp," Ex. 229; and on July 7, 2020, HU reminded BAI "to bring 4[K] cash to me tomorrow," Ex. 230 at 4.

Accordingly, for HU, money laundering was not a one-time or occasional activity.  Rather, HU was regularly engaged in laundering gift cards representing criminal proceeds over an extended period, and he generated significant income from this activity.  HU was therefore in the business of laundering funds, and a 4-level increase should apply pursuant to U.S.S.G. § 2S1.1(b)(2)(C).  PSR ¶¶ 46-49; U.S.S.G. § 2S1.1 n.4(B) (factors to consider when applying this offense characteristic include regularity and extensiveness of activity and generation of substantial revenue).

C.   HU Engaged in Sophisticated Laundering Involving Multiple Layers: +2

The government and the USPO agree that HU's offense conduct exemplified the use of layering typically involved in sophisticated

laundering.  PSR at ¶¶ 50-52.  The crux of the money laundering
conspiracy in which HU was initially a runner and later a manager or
supervisor was to distance fraud-induced proceeds from the fraud
victims.  As proven at trial, the defendants did this by employing
multiple laundering techniques that included layering of transactions
involving criminally derived funds that were intended to appear
legitimate.  One refund technique involved two transactions to load
the wire fraud proceeds onto a new physical gift card.  See Ex. 214
at 2 (BAI telling HU, "don't leave any balance . . . you need to
spend all.  You can buy anything, and just spend all.  If what you
bought was not what I wanted, you can just get refund back to the
physical card after a few days and then give it to me"); Ex. 215 at 4
(BAI telling HU, "you can buy anything and just turn it into card
balance later"); see, e.g., Exs. 60-65 (laundering of victim V.E.'s
cards in November 2020 using this method).  Another technique
involved using $5 gift cards, to which the defendants transferred the
balance from victim-purchased cards and which runners then spent.
See Ex. 278 (BAI instructing HU and SHI to buy $5 cards for him);
see, e.g., Exs. 2-5, 6E (laundering of victim K.G.'s card using this
method).  Therefore, the 2-level increase under U.S.S.G.
§ 2S1.1(b)(3) should apply.

    D.   HU was a Manager or Supervisor: +3

    The government and the USPO agree that HU merits an aggravating
role enhancement, because he was a manager or supervisor of the
defendants' money laundering conspiracy, which involved five or more
participants or was otherwise extensive.  See PSR at ¶¶ 54-58.  First,
with four convicted participants (BAI, HU, SHI, and Yan Fu) plus
Magic Lamp members like "4," the criminal activity involved at least

11

1  five culpable participants.  Given its duration, volume, and
2  transnational scope as discussed above, the activity was also
3  extensive.

4      Second, HU was a manager or supervisor of that activity.  The
5  trial evidence showed that HU, within a few months of the
6  conspiracy's inception, recruited and directly managed multiple
7  runners, including Yan Fu and "Second Sister," who then used the
8  Magic Lamp-sourced gift cards to purchase Target merchandise at HU's
9  direction.  In fact, the government proved at trial that HU obtained
10 from Magic Lamp and then immediately forwarded to one or more of his
11 runners the Target gift cards that had been fraudulently obtained by
12 scammers from half of the sample victims who testified at trial.  See
13 Exs. 11-13 (in September 2019, HU obtained from Magic Lamp and sent
14 to Yan Fu Target gift cards that had been fraudulently obtained from
15 victim-witness D.L.); Exs. 23-24 (in January 2020, HU obtained from
16 Magic Lamp and sent to Yan Fu and Second Sister a Target gift card
17 that had been fraudulently obtained from victim-witness R.A.); Exs.
18 34-35 (in February 2020, HU obtained from Magic Lamp and sent to Yan
19 Fu Target gift cards that had been fraudulently obtained from victim-
20 witness W.F.); Exs. 42-43 (in June 2020, HU obtained from Magic Lamp
21 and sent to Yan Fu Target gift cards that had been fraudulently
22 obtained from victim-witness K.K.).[4]  Because the conspiracy would
23 not have been successful without HU's management of runners to whom

24 _____

25     [4] Ten representative victims testified at trial, two sets of
   which were sets of spouses (V.E. and T.E., and A.M. and D.M.) who
26 testified about the same gift card fraud.  Accordingly, the
   government called victim witnesses to testify about eight
27 representative instances of gift card fraud, and the evidence proved
   that HU funneled the cards that resulted from four of those eight
28 frauds (the cards of victims R.A., W.F., K.K., and D.L.) to runners
   to launder.

1    he funneled thousands of Target gift cards, HU qualifies for the 3-

2    level increase under U.S.S.G. § 3B1.1(b).[5]

3        E.    Restitution

4        For Count One, starting from Target gift cards which appeared in

5    some of the defendants' message threads with each other and/or the

6    Magic Lamp, or cards that were in BAI's possession (either in a

7    Target application associated with him or in his Google account), the

8    government located identifiable victims who had complained to police

9    departments, Target Corporation, the FBI's Internet Crimes Complaint

10   Center (ic3.gov), and agencies that report to the Federal Trade

11   Commission's Consumer Sentinel, to create victim lists that have been

12   shared with defense counsel.  In many cases, these victims reported

13   purchasing multiple Target and other gift cards as part of the scam,

14   but the proposed restitution is limited to the gift cards tied to

15   this case as described above.  The government has disclosed the gift

16   cards and dates to defense counsel and the USPO.[6]

17   BAI is liable for all the proposed Count One restitution, which

18   totals $94,615.19.  HU is liable for the share of victims who

19   purchased cards after September 17, 2019, the date of Yan Fu's

20   detention, which totals $57,156.26.  SHI is liable for losses between

21   September 17, 2019 and September 25, 2019, and February 13, 2020 to

22   the end of the conspiracy, for a total of $39,416.33.  To the extent

23

24       [5] As a result, HU is not eligible for subtraction of 2 levels
25   for having zero criminal history points.  U.S.S.G. § 4C1.1(a)(10)
     (defendant who receives an upward aggravating role adjustment is not
26   eligible for 2-level decrease).

27       [6] The victims on the lists have been specifically identified by
     their having self-reported their names, addresses, and other contact
     information on a complaint or police report.  There exist many
28   victims beyond those listed who the government has not been able to
     individually identify with sufficient specificity.

                                      13

1   of each defendant's Count One liability, he is liable jointly and

2   severally with the other defendants in this matter.[7]

3        For Count Two, the government likewise identified five victims

4   by tracing the known cards, see Ex. 362T at 6, that BAI enlisted CC-1

5   to sell.  These identifiable victims' cards totaled $3,200.

6   Therefore, BAI's combined restitution liability is $97,815.19.

7   **IV.   A SENTENCE OF 135 MONTHS, REFLECTING A SENTENCE AT THE LOW-END
        OF THE ADVISORY GUIDELINES RANGE, IS SUFFICIENT BUT NOT GREATER**

8   **THAN NECESSARY TO ACHIEVE THE PURPOSES OF FEDERAL SENTENCING**

9        Should the Court agree with the government and the USPO that

10  HU's offense level is 33, the corresponding advisory guidelines

11  sentencing range is 135-168 months.  The government believes a

12  sentence of 135 months, representing the low end of the guidelines

13  range, is the appropriate sentence in this matter.  The government

14  addresses below the most salient of the § 3553(a) factors.

15       A.   Nature and Characteristics of the Offense, and History and
              Characteristics of HU
16

17       HU exemplifies the role of third-party money launderers and

    fences in a broader criminal ecosystem.  Despite not being the
18
    telephone scammers, HU and his co-conspirators were indispensable to
19
    the success of the underlying fraud schemes that generated their
20
    Target gift cards.  By racing from one Target to another to exchange
21
    cards for harder-to-trace merchandise, or fresh gift cards, HU and
22
    his co-conspirators quickly untethered the fraud proceeds from the
23
    victims' and Target's control.  Furthermore, by transmitting payment
24
    back to the Magic Lamp in Chinese currency (thereby exchanging the
25

26   _____

27        [7] The current list is greater than that included in the list
     proposed for Yan Fu's sentencing, more than one year ago, because the
28   government mistakenly overlooked potential sources of identified
     victim information in its earlier effort.

dollar-denominated proceeds), HU and his co-conspirators enabled the success of the wire fraud scheme and encouraged its continuation.  In other words, by providing an infrastructure to allow the foreign fraudsters to reap the proceeds of their telephone scams, HU ensured that more American consumers would be victimized.

Accordingly, HU merits the full impact of the guidelines contemplated for third-party money launderers in Count One.  Nothing in his history and characteristics merits a variance.  HU's conduct was extremely harmful, and the fact that he continued to participate after learning of red flag after red flag weighs significantly against him.  Indeed, HU continued laundering Target gift cards even after becoming aware that (1) gift cards were sourced from "telecom scams," Ex. 248 at 4-5; (2) stores in certain geographic areas were to be avoided because of nearby sightings of plainclothes police officers, Ex. 218; (3) the "very top of the card merchants got caught," Ex. 219 at 2; and (4) two of his own runners were each independently arrested and/or detained by local police for using fraudulently-obtained gift cards that he had personally supplied them--Yan Fu in September 2019 and Second Sister in January 2020, Exs. 11-12, 13, 14E, 18R, 16, 266; Exs. 21, 24, 26.

     B.   <u>Need for the Sentence to Reflect the Seriousness of the Offense, Promote Respect for the Law, and Provide Just Punishment for the Offense, and Need to Promote Deterrence</u>

The imposter fraud and tech support scams funding the gift cards that HU laundered continue to occur and are responsible for hundreds of millions of dollars in reported consumer losses, according to data published by the Federal Trade Commission.  <u>See</u> https://public.tableau.com/app/profile/federal.trade.commission/viz/GovernmentImposter/Infographic, accessed 2/26/2024 (Social Security

15

Administration Imposter Scams alone caused $126.53 million in losses reported to FTC for 2023).  As noted above, runner networks like the one HU managed and supervised in this case are indispensable to the operation of these transnational scams.  Target has no stores outside the United States.  Without the domestic infrastructure operated and maintained by HU and his co-conspirators to orchestrate the near-immediate spending of the victims' gift cards, the scam would fail because the international scammers would not be able to turn the gift cards into value they can use in their own countries.  Communications on HU's and his co-defendants' phones show that they shared information with each other about criminal cases, including press articles about gift card runners.

Given the importance of laundering to criminal enterprises, it is unsurprising that the money laundering sentencing guidelines are intended "to provide for substantial punishment for defendants who encouraged or facilitated the commission of further crimes."  United States v. Rose, 20 F.3d 367, 375 (9th Cir. 1994) (internal quotations omitted).  This principle is reinforced for third-party money launderers "who routinely engage in laundering funds on behalf of others, and who gain financially from engaging in such transactions."  United States v. Aguasvivas-Castillo, 668 F.3d 7, 14 (1st Cir. 2012) (internal quotations and citations omitted).  Under the guidelines, such defendants, "similar to a professional fence, . . . warrant substantial additional punishment because they encourage the commission of additional criminal conduct."  United States v. Mitchell, 613 F.3d 862, 869 (8th Cir. 2010) (internal quotations and citations omitted); cf. United States v. Nicolescu, 17 F.4th 706, 723

16

1  (6th Cir. 2021) ("Fences induce others to commit property crimes by
2  providing them with a ready market for their stolen goods.").

3       Accordingly, a robust sentence in this matter could be critical
4  to deterring others from participating in similar money laundering
5  activity, and to slowing the scams generally.

6       C.   Avoiding Unwarranted Sentence Disparities

7       One major sentencing consideration is avoiding "unwarranted
8  sentence disparities among defendants with similar records who have
9  been found guilty of similar conduct." § 3553(a)(6).  This principle
10 is likewise a goal of the sentencing guidelines.  See U.S.S.G. Ch. 1,
11 Pt. A(1)(3) (citing United States v. Booker, 543 U.S. 220 (2005))
12 ("Congress sought reasonable uniformity . . . in sentences imposed
13 for similar criminal offenses committed by similar offenders."); see
14 also 28 U.S.C. § 991(b)(1)(B).  The corollary to this principle is
15 that meaningful differences between defendants should be reflected
16 through meaningfully different sentences.

17      Summarized below are the guideline ranges of BAI, HU, and SHI,
18 and the government's recommendations as to each defendant:

|                       | BLADE BAI                          | BOWEN HU              | TAIRAN SHI            |
|-----------------------|------------------------------------|-----------------------|-----------------------|
| Guideline Range       | 210-262                            | 135-168               | 135-168               |
| Recommended Sentence  | 180 (Counts One and Two)           | 135 (Count One)       | 108 (Count One)       |

23      The government's concurrently filed sentencing memoranda for BAI
24 and SHI explain why the government recommends 2-level downward
25 variances for BAI and SHI.  The government's recommendation of 135
26 months for HU fairly reflects meaningful differences between HU and
27 his co-defendants.  A sentence of 135 months for HU, contrasted to
28 the 168 months recommended for BAI on the count they have in common

(Count One), would distinguish HU from BAI as having been recruited, trained, and supervised by scheme leader BAI, as well as the fact that HU had less general business experience than BAI. Furthermore, a 135-month sentence for HU, contrasted to 108 months for SHI, would distinguish HU from SHI as having recruited SHI, handled substantially more gift cards (thus contributing to more victim harm), and having separate communication lines with Magic Lamp members and other associates from which he directly learned (and utterly disregarded) that the gift cards were sourced from telecom scams. And a sentence of 135 months for HU appropriately distinguishes him from already-sentenced and less culpable runner Yan Fu, who took orders from HU and, though charged at the same time as HU, long ago admitted not just her guilt but the full harm she caused.[8]

**V.   CONCLUSION**

For the foregoing reasons, the government respectfully requests that the Court sentence HU to a total of 135 months of imprisonment, a three-year term of supervised release, restitution in the amount of $57,156.26 to approximately 77 identified victims, a $100 special assessment, and criminal forfeiture as recommended in the government's separate filing.

---

[8] Due to her health and other factors inapplicable to HU, the government recommended a 46-month sentence for Yan Fu; this Court imposed a 20-month sentence.

18